THE LAW OFFICES OF

# VINCENT J. MARTINELLI

### ATTORNEY AND COUNSELOR AT LAW

*Executive Suites at The Park*
900 SOUTH AVENUE – 3rd FLOOR
STATEN ISLAND, NY 10314
TELEPHONE: (718) 667-0500
VJMLAW@si.rr.com

ADMITTED IN NEW YORK
AND NEW JERSEY

April 16, 2020

The Honorable William F. Kuntz, II
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:     United States v. Vito DiFalco**
Criminal Docket No. 18-337 (S-1) (WFK)

Dear Judge Kuntz:

Please accept this letter as a sentence memorandum on behalf of Mr. Vito DiFalco, currently scheduled to be sentenced on September 23, 2020.

Additionally, pursuant to my recent conversations with the Government, we are jointly requesting that Mr. DiFalco's sentence hearing be advanced to the earliest possible date via video conference or telephone and would waive Mr. DiFalco's right to an appearance in the Courtroom. This request is completely consistent with recent Administrative Order No. 2020-13 of the Court, Paragraph 2, whereby telephone or video conference sentence hearings may be conducted if consented to by the defendant. Moreover, it is consistent with the Government's recent requests for defendants Joseph Maratea and Salvatore Disano and with Your Honor's order, dated April 14, 2020, filed under ECF No. 231.[1] Finally, it is consistent with the administration of justice, as follows in the next paragraph immediately below.

Mr. DiFalco pled guilty on March 18, 2019 and a PSR was first ordered by Your Honor to be delivered by September 18, 2019. However, Your Honor granted Probation's September 2019 *ex parte* request to delay delivery of the PSR and a sentence hearing date of March 13, 2020 was ordered. The PSR was finally delivered to me on

---

[1] Your Honor advanced defendant Joseph Maratea's sentence hearing to April 15, 2020 but have not, to my knowledge, advanced defendant Disano's sentence hearing.

January 31, 2020 and a brief objection letter to the PSR was timely filed on February 13, 2020.  *See* ECF No. 184.[2]  But due to the Court's schedule and prior to the COVID-19 epidemic, the sentencing was adjourned by Your Honor until May 1, 2020.  Finally, because of the COVID-19 outbreak, Your Honor delayed sentencing again until September 23, 2020.  I have not yet received a PSR Addendum or Final PSR addressing any of the objections made on behalf of Mr. DiFalco.

After conversation with the Government, we jointly request that it be advanced to the earliest possible date via telephone or video conference.  Mr. DiFalco additionally respectfully requests that Your Honor incorporate by reference all of the arguments that were made in his recent bail application, dated April 10, 2020 and filed under ECF No. 227, as they are also critical to his sentence arguments.

## BACKGROUND

On July 11, 2018 Mr. DiFalco was arrested pursuant to an Indictment and on August 1, 2018, the Government filed a 34-count Superseding Indictment.

On March 18, 2019, Mr. DiFalco pled guilty to Count One of the Superseding Indictment, charging the defendant with racketeering under 18 USC § 1962(c).  He specifically pled to predicate acts involving making small loans to two (2) individuals using extortionate rates of interest - John Doe No. 8/Racketeering Act 12 and John Doe No. 9/Racketeering Act 13).

## DISCUSSION

I.    **Legal Standard**

As the Supreme Court said in Pepper v. United States, 131 S.Ct. 1229 (2011), the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  Id., 131 S.Ct. At 1240 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)).  That process is embodied in the advisory sentencing system instituted by the Supreme Court's decision in United States v. Booker, 125 U.S. 738 (2005), which "breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the Section 3553(a) factors to the criminal defendants that come before them." United States v. Jones, 531 F.3d 163, 170 (2d Cir. 2008) (district court must make an "individualized assessment" of the sentencing warranted by 3553(a) "based on the facts presented" and "may not presume that the Guidelines range is reasonable").  The deference granted a district court's determination springs from its "singular advantage of

---

[2] The objection-letter was made, mainly, regarding Probation's incorrect statements regarding the purported lack of filing of his required tax returns and his incomplete MDC medical records.  Mr. DiFalco had properly filed tax returns for every year through his 19-year job as a NYC DOE school custodian and those were submitted to Probation and the Government, as well as an update on his MDC medical records.

actual and extensive sentencing experience," as well as its familiarity with the individual case and the individual defendant before it." Id. at 170.

Consistent with the principle of individualized sentencing is the wide discretion afforded the sentencing judge "in the sources and types of evidence used to assist in determining the kind and extent of punishment to be imposed", in particular, "the fullest information possible concerning the defendant's life and characteristics". *Pepper*, 131 S.Ct. At 1240 ("sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant"). Indeed, as *Pepper* points out, this principle is codified in 18 U.S.C. 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). Pepper v. United States, 131 S.Ct. 1229, 1242 (2011).

In United States v. Booker, 543 U.S. 220 (2005) the Supreme Court rendered the Sentencing Guidelines "effectively advisory". *Booker*, 543 U.S. at 245. Post-*Booker*, as the Second Circuit observed, [i]t is now ... emphatically clear that the Guidelines are guidelines - that is, they are truly advisory. *Cavera*, 550 F.3d at189.

As a procedural matter, district courts "must treat the Guidelines as the starting point and the initial benchmark- in calculating a sentence. Kimbrough v. United States, 552 U.S. 85, 108 (2007) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)). However, sentencing courts may not presume that a Guidelines sentence is reasonable. See Nelson v. United States, 129 S.Ct. 890, 891-92 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable" [emphasis in original]); see also *Cavera*, 550 F.3d at 189 ("district court may not presume that a Guidelines sentence is reasonable"). Additionally, the Guidelines may not be assigned any presumptive weight over the other factors set forth in § 3553(a). United States v. Fierkhoglyad. 516 F.3d 122, 131 (2d Cir. 2008).

*Gall*, *Kimbrough*, and *Nelson* have effectively restored the district courts' broad sentencing discretion by permitting them to impose a sentence after considering all the USSG § 3553(a) factors, with the Guidelines being only one such consideration. United States v. Jones, 531 F.3d 163, 173-74 (2d Cir. 2008). Adhering to *Booker* and *Jones*. Section 3553(a) requires this Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in § 3553(a)(2).

All of these factors favor a time-served sentence for Mr. DiFalco.

## II.    Analysis

A time-served sentence, whereby Mr. DiFalco has already served approximately 21-months at MDC - including during the well-chronicled MDC blackout in the Fall of

2018 and the present COVID -19 crisis[3] - at Mr. DiFalco's age and health conditions would be sufficient, but not greater than necessary to satisfy the statutory mandates of 18 USC § 3553(a)(1-7), as follows.[4]

###### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The Nature and Circumstance of the Offense

Mr. DiFalco agrees with the PSR at ¶¶ 30-31, and 58. In short, there is little doubt that "for more than a year" he made usurious loans at 3% interest per week through a racketeering enterprise. However, as ¶ 31 at the last sentence shows, the Government has also advised that "the precise amounts of money demanded and/or collected from each victim is unknown … Moreover, there were no injuries suffered by the victims".

Additionally, Mr. DiFalco agrees with the PSR at ¶ 58 which states that for a 5-month period in 2018, he conducted a gambling enterprise at his bar, Trist Lounge, or Maratea's pawn shop, that included sports gambling and bookmaking through an on-line website, and a "Super Bowl pool policy scheme, March Madness pool policy scheme and video gambling machines." Essentially, and I am sure that the Government will not disagree from this view of the evidence, it was two decrepit joker-poker machines that generated probably *zero* income, an ordinary local-bar Super Bowl pool, an ordinary, local-bar March Madness pool, and some very *limited* gambling through an on-line betting service.

The History and Characteristics of the Defendant

Mr. DiFalco stands before this Court at 65-years of age having never been arrested or convicted for any offense. He has an impeccable work history, having worked the 19-years prior to this arrest and incarceration as a NYC DOE school custodian. The last few years he also tried his hand at owning a bar/lounge on 13th Avenue in Brooklyn.

---

[3] Again, plea see Mr. DiFalco's bail application, dated April 10, 2020 and filed under ECF No. 227.

[4] Additionally, under the recently enacted CARES Act, Pub. L. No, 116-136, § 12003(b)(2) (2020), if the Attorney General finds the emergency conditions will materially affect" the BOP's functioning, the BOP Director may "lengthen the maximum amount of time for which [he] is authorized to place a prisoner in home confinement" under 18 USC § 3624(c)(2). The Attorney General has, in fact, made such a finding regarding the emergency conditions that now exist as a result of coronavirus. *See* Memorandum from Attorney Gen. William Barr to Director of Bureau of Prisons (April 3, 2020, hereinafter the "Barr Memo"), https://www.justice.gov/file/126661/download. Thus, depending on Your Honor's actual sentence, Mr. DiFalco may *already* be eligible for home confinement pursuant to the new Attorney General Memorandum. And this Court is additionally empowered to make such a recommendation to the BOP Director for maximum home confinement.

While that has been terribly unsuccessful, financially - it has done nothing but lose money – he kept his employees working and his bills paid.  In fact, he kept his main job at the DOE and was considered nothing but an asset.  He was a member in good standing of Local 32BJ S.E.I.U. from 1997 through his arrest in 2018.  From 1994 -1996, he owned two different coffee and paper-goods supply businesses, Paramount Foods and Old Time Coffee and Paper.  From 1972 (right after graduating Fort Hamilton High School in 1971) he was a salesman for a shirt company and in the fruit distribution business working at various fruit markets.  As is a common expression or thought, my own father used to say that, "*the true measure of man is how hard he has worked his whole life; how he got up every day and went to work*".  Mr. DiFalco fits that description of a worthy individual perfectly.

As his boss, Frank Zapata, Jr. has written to the Court of him:

*"Victor does outstanding work and he also works well unsupervised, Additionally, I know him to take great care of his family at all times ... he is well liked by all in the community, especially at Local 32BJ,  In fact, I would put him back to work immediately if I could."*

And as co-worker and supervisor Peter Foti describes:

*"Mr. DiFalco last worked at school K871 located at 67-69 Schermerhorn Street where he was the school handyman.  The site was very sensitive as it was a Life Center which housed pregnant teens and a nursery."*

I believe that site was the former NYC Board of Education (as the NYC DOE was formerly known) headquarters and is an extremely important assignment.

Further, Mr. DiFalco is a good father to his daughter Brittany and his step-daughter Desirae, an admired brother to his brother John and his sister Phyllis (and her husband David), a reliable ex-husband to his former wife Mary, who has stood by him during this arrest, and his character references are glowing.

As an example, Brittany, a licensed social worker working for a private therapist, writes:

*"My father, had intentions of giving me all the opportunities he never had, which he did, in every aspect of life. The person I am today, my education, and career path, was influenced by my parents. My father taught me how to treat everyone as an equal human, regardless of mistakes, because mistakes are lessons; to be generous with time, emotions, support & lend a helping hand to those in need. My father was a respected man in the community, not because of fear, but because of genuine kindness. He is a calm, logical, intelligent man, with a high work ethic. We have never gone without, not me or my mother, or my sister and his grandchildren. This is not because of finances, but the amount of empathy and care my father holds. He has kept a tax paying, city job for years to give us a stable life. I've never met a person with a negative thing to say about my father, not*

> *the deli man behind the counter or even his ex-wife."*

Mr. DiFalco's sister, Phyllis, and her husband David, are retired. David was ordained and worked as a United Methodist Minister for a large congregation in Wayne, NJ. They have signed a joint letter together. They write:

> *I am Vito's sister, and as such have known Vito all his life (he is 5 years younger than me). We were very close growing up. We lived with our parents and Vito's twin brother John in a four room apartment in Brooklyn until I was 23 when I married a man who was studying to be a United Methodist minister. At that time I moved out of Brooklyn as my husband went to seminary at Drew Theological School in Madison New Jersey and served churches in New Jersey throughout his career. We are now retired but still live in New Jersey.*

> *My parents stayed in Brooklyn, however, and we visited (or they visited us) weekly, so we stayed in touch with Vito as well over the years. There came a time when my parents became unable to care for themselves and they moved in with us (in 1992) and lived with us in parsonages in Wayne and Wyckoff NJ until they died in the early 2000's. During that time Vito also lived with us for about six months as he worked as a coffee distributor before returning to Brooklyn. The bond he already had with our children deepened during that time, and they have all continued to stay in touch as we continued to see each other at holidays, birthdays, etc. They remain in touch with him via phone and text messages to this day, even while he is incarcerated.     He has always been a loving brother to me and my husband and loving uncle to our children. My husband and I visit with him several times a month during his incarceration.*

> *We have always known Vito as a hard worker who cared for his family. After leaving Wayne Vito continued to work in the coffee distribution business until he began his work with the Board of Education and later also opened a bar in Brooklyn. He never betrayed to us or our family any of the activities to which he has confessed, insulating us, I suppose, from that information.*

> *At the same time, we have never known him to be a danger to himself or a threat to others. We hope that, as a first time offender at such an advanced age and with the family connections that he has, you will find him deserving of leniency in his sentencing.*

David, has called me almost weekly for concerned updates for himself and Phyllis about his brother-in-law's case.

*See* the eight (8) letters attesting to Mr. DiFalco's good character, attached as Exhibit A for the Court's convenience.

**B. The Need for the Sentence Imposed**

The Court must consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Even though Mr. DiFalco was first arrested and incarcerated on July 11, 2018, if he were sentenced today and were given a time-served sentence, for instance, it would be the functional equivalent of a 26-month sentence.[5] And that sentence, does not account for the horrors of spending the last 21-months inside the MDC, at his age and with his medical conditions. And such a sentence, with having to endure such treatment while at the MDC, would easily reflect the seriousness of this-type of RICO offense, as well as promote respect for the law and provide just punishment, adequate deterrence, and protection from the public from the further of the defendant's crimes.

**C. The Kinds of Sentences Available**

Mr. DiFalco agrees with the PSR at ¶¶ 235 – 244, which correctly analyzes all available statutory minimums and maximums and Guidelines ranges. However, as for a proper Guidelines analysis, ¶ 236 is expanded upon in the remainder of the PSR at ¶ 251, which highlights a plea agreement and Probation Guidelines analysis resulting in Level 21, Criminal History Category I and a Guidelines range of 37 - 46 months.

**D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses**

Mr. DiFalco agrees, as also stated above, that the Guidelines range listed in the PSR at ¶ 251 is correct at 37-36 months. However, a downward variance to time-served is also perfectly allowable under 18 USC § 3553(a). I respectfully submit that based on all of the arguments made, herein, especially those in Section A, above, "The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant", and Section F, below, "The Need for Unwarranted Sentence Disparities, a time-served sentence is sufficiently appropriate. Especially when this memorandum is combined with the arguments made in the April 10, 20120 bail application filed under ECF No. 227.

A time-served sentence would be the functional equivalent of a 26-month sentence. A time served-sentence with any period of supervised release that has an added condition of home detention as a condition of any period of supervised release would be

---

[5] All defendants are entitled to 54 days per year "good time" (4.5 per month), which Mr. DiFalco would be presently entitled. This would "discount" Mr. DiFalco's hypothetical 26-month sentence by approximately 117 days (almost 4 months) – which would be about where he is calculated at now. And that does not take into account any home detention eligibility from the BOP (Barr Memo).

the functional equivalent of *more than* a 26-month sentence (for the amount of months of home detention added to supervised release).

### E.      Pertinent Policy Statement(s) of the Sentencing Commission

This factor is not relevant to Defendant's sentencing.

### F.      The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Mr. DiFalco's co-defendant in all of the precise activity alleged by Mr. DiFalco, Joseph Maratea, has just received from Your Honor a time-served sentence. While I am absolutely certain that the Government will allege that Mr. DiFalco's activity was more egregious than Mr. Maratea's activity because of his position in the conspiracy, and that he deserves a higher sentence - in fact, Mr. Maratea was ruled to have a *minor role* in the offense conduct - it is also true that Mr. DiFalco's age and documented medical conditions are relevant to the debate that any sentence that is more than a time-served sentence for *him* is an injustice. The PSR at ¶¶ 216 -219 and the medical records attached as part of his April 10, 2020 bail application, ECF No. 227, confirm his conditions.

Finally, the "Barr Memo", mentioned above in Footnote No. 4, can be accounted for with any period of home detention *added to* the time served sentence as a condition of supervised release, as Your Honor recently ruled regarding Mr. Maratea. Thus, to account for unwarranted sentence disparities, if Mr. Maratea's sentence was 26-months plus 4 months home detention (with a 30 -37 month suggested Guidelines Range and plea agreement), a time-served sentence for Mr. DiFalco at 26-months with *six* months of home confinement as a condition of supervised release would be the functional equivalent (with a 37 - 46 month Guidelines range and plea agreement). That does not even take into account Mr. DiFalco's advanced age and heightened health difficulties.

### G.      The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to ¶ 59 of the PSR, while restitution is mandatory pursuant to 18 USC § 3663A, neither the Government nor the victims themselves - although properly notified - have provided any purported losses the victims may have suffered. This is most probably because the alleged victims have borrowed money from the defendant in this matter and have not, in fact, ever yet met the principal; or at least the principal plus any statutory allowable amount of interest.

**CONCLUSION**

I respectfully submit that a sentence of time-served, one (1) year of supervised release, no fine because of an inability to pay any fine as reflected in the PSR at ¶¶ 232-234, a forfeiture money judgement in the amount of $10,750 as listed in the plea agreement and referenced at ¶ 235 of the PSR, and a $100 mandatory special assessment is appropriate and comports with the dictates of § 3553.

This sentence is consistent with, and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2).

Thanking you in advance for your time and consideration.


Very truly yours,

*Vincent Martinelli*

Vincent J. Martinelli


CC: All Parties via ECF