

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| EAG/MSM | *271 Cadman Plaza East* |
| F. # 2017R01548 | *Brooklyn, New York 11201* |

April 17, 2020

By ECF

The Honorable William F. Kuntz, II
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Vito Difalco
                  Criminal Docket No. 17-337 (S-1) (WFK)

Dear Judge Kuntz:

        The government respectfully submits this letter in connection with the defendant Vito Difalco's sentencing. For the reasons set forth below, the defendant should be sentenced within the applicable Guidelines range of 37 to 46 months' imprisonment. The government does not object to Difalco's request that the Court advance Difalco's sentencing, which is currently scheduled for September 23, 2020, to a date in the Spring of 2020.

## BACKGROUND

        On July 5, 2018, a grand jury returned a sealed 32-count indictment against the defendant Vito Difalco and his codefendants. As charged in the indictment, Difalco engaged in racketeering as an inducted member of the Colombo organized crime family of La Cosa Nostra (the "Colombo family"), with a pattern of racketeering activity involving multiple instances of loansharking and the operation of illegal gambling businesses within the Eastern District of New York. On March 3, 2019, Difalco pleaded guilty to racketeering, in violation of Title 18, United States Code, Section 1962(c).

I.    Difalco's Association with and Membership in the Colombo Family

        The defendant Vito Difalco has long been an associate with the Colombo family and, as noted above, is now an inducted member of the Colombo family, a violent criminal enterprise that engages in crimes including murder, robbery, extortion and obstruction of justice. In becoming an inducted member, Difalco swore allegiance for life to

the crime family above all else, even his own family. Significantly, during the months-long investigation, law enforcement conducted surveillance on multiple occasions of Difalco and other inducted members meeting with the Colombo family captain to whom they reported.

II.     The Loansharking Business

The defendants Vito Difalco and Joseph Maratea operated a loansharking business, as part of which they extended loans at exorbitant interest rates and under the threat of bodily harm if interest payments were not made on a timely basis. Specifically, they charged $15 in weekly interest payments on every $500 extended, which amounted to 3% weekly interest payments or 156% annual interest. To ensure both that they could locate their debtors and that their debtors understood that Difalco and Maratea knew where they resided, they required debtors to provide copies of their driver's licenses and their contact information. One of those driver's licenses was recovered during a search of Maratea's business.

Although both Difalco and Maratea spoke cautiously over the telephone, their participation in the loansharking business was made clear by their telephone calls to each other and to their debtors. For example, following a series of communications in which Difalco and Maratea discussed collecting from one of their loanshark debtors, Difalco told Maratea, "Alright we will take care of this tomorrow. Maybe bright and early in the morning. When he's comfortable," demonstrating an intent to confront a debtor early in the morning in order to better intimidate him. On a February 10, 2018 phone call (#2438), Difalco and the same loanshark debtor had the following conversation:

> DIFALCO:     So this week where are we getting an income from?
>
> John Doe #8: Ah Tuesday.
>
> DIFALCO:     Okay Tuesday for sure so I got you and [John Doe #9] on Tuesday. See how calm I do it now?
>
> John Doe #8: [U/I]
>
> DIFALCO:     I, I don't get aggravated anymore cause this is how I look at it. Good things happen to me when I stay calm see like I was by your house the other day.
>
> John Doe #8: Yeah.
>
> DIFALCO:     Four years ago, I would have put the Benz on fire.
>
> John Doe #8: I know.

Significantly, John Doe #8 had a Mercedes Benz at that time and in the above call, Difalco implicitly threatened John Doe #8 by making clear to him that he had visited John Doe #8's house to search for him a few days earlier ("like I was by your house the other day") and that

2

he had a past history of setting on fire the cars of those debtors who did not make timely payments ("Four years ago, I would have put the Benz on fire.").

On February 13, 2018 at 12:05 p.m. (#2727), Difalco called John Doe #8, who had not paid Difalco when Difalco expected to be paid, and they had the following conversation:

> DIFALCO: [John Doe #8], let's do this, let's do this. Okay? Let's do this. Okay, I'm gonna say this very nicely.
>
> John Doe #8: Oh, okay.
>
> DIFALCO: I'm in a good mood, now destroyed my whole fuckin' day.
>
> John Doe #8: Okay.
>
> DIFALCO: I'm gonna be calm on this. Okay?
>
> John Doe #8: Mmm hmm.
>
> DIFALCO: How much you gonna bring Thursday, first of all?
>
> John Doe #8: Umm, 400 [static].
>
> DIFALCO: I can't hear ya.
>
> John Doe #8: [UI static].
>
> DIFALCO: I can't hear ya. You're breakin' up. Say that slowly.
>
> John Doe #8: [UI static] three [UI static].
>
> DIFALCO: See, that's no good. 'Cause you're goin' backwards. Watch. You skipped for three, you give me three, you're not accomplishin' nothin'. This is what you do Thursday, and I'm gonna be in a good mood. Ready? Thursday, you bring a nickel.
>
> John Doe #8: Okay.
>
> DIFALCO: Nothin' less than that. A nickel.
>
> John Doe #8: Okay.
>
> DIFALCO: Because what you're doin' is rope-a-dope and I'm gonna get aggravated. But, I'm not gonna get aggravated on the phone. Now Thursday.

3

John Doe #8: Okay.

Again, Difalco implicitly threatened John Doe #8 that although he was not going to make an explicit threat over the phone, likely because he was aware that his phone could be intercepted by law enforcement ("But, I'm not gonna get aggravated on the phone"), he would get "aggravated" in person if John Doe #8 did not make a timely payment.

On April 12, 2018 at 1:44 p.m. (#12239), Maratea called Difalco and expressed his dismay at a debtor who was not answering his repeated calls:

> DIFALCO: I'm going to go home in the late afternoon and shower, and then tonight we'll take care of everything. We'll go get, whatever, but call that idiot in Staten Island.
>
> MARATEA: He isn't answering, that motherfucker. He hasn't been answering.
>
> DIFALCO: Well, we'll call from a strange number.

A week later, on April 19, 2018 at 7:44 p.m. (#13613), after several additional communications over several days about John Doe #8's missed payments, Difalco called Maratea and the two had the following exchange:

> DIFALCO: Alright stretch out, 'cause we are going to take a ride in a little while. [John Doe #9] just called, he'll be around tomorrow, Saturday, he starts work Monday. I'll tell you what I spoke to him about when I see you.
>
> MARATEA: Alright.
>
> DIFALCO: I'll be here, then we'll take a ride up there.
>
> MARATEA: Where by [John Doe #8]?
>
> DIFALCO: Yeah, we'll go by [John Doe #8].
>
> MARATEA: Did you call him?
>
> DIFALCO: I called him, he didn't pick up. I figure I'll ring the bell and flood the house.
>
> MARATEA: Alright let's go there.

In that call, it appears that Difalco and Maratea were planning to go to the residence of John Doe #8 and make their presence - and more significantly their intention to keep harassing John Doe #8 until he paid them – known by ringing his doorbell and "flood[ing]" the

4

building.  A xeroxed copy of the driver's license of John Doe #8 was found during a search of Maratea's business, suggesting Maratea and Difalco had recently used it to track down John Doe #8's residence.

On Saturday, April 21, 2018 at 9:42 p.m. (#13829), Difalco called another individual and said, "Shut up let me talk to you, you know how mad against the whole world. [U/I] You know who else?  You know I'm gonna rip their fucking heart out between this kid Carlos and this other jerk off that lives what's this other kid's name [John Doe #8], this fucking fraud."  On April 25, 2018 at 7:48 a.m. (#14508), Difalco called [John Doe #8] and left a message, "[Nickname for John Doe #8], scum bag. You're gonna make it so I make your uncle Dominic hate you.  'Cause your just a fuckin' lice. Then I'm gonna grab this kid fuckin' Peter.  He brought me to you, and I'm gonna make him punish you while I'm punishing you."

III.    The Gambling Business

The defendant also earned illegal proceeds through his gambling business, which included sports-betting, video gambling machines and Super Bowl and March Madness pools.

## DISCUSSION

The government respectfully submits that, in this case, a sentence within the Guidelines range is appropriate in light of all relevant factors, including the nature and characteristics of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

I.    Legal Standard

The Sentencing Guidelines are advisory, not mandatory.   United States v. Booker, 543 U.S. 220, 258-60 (2005).  However, the Supreme Court held in Booker that sentencing courts must consider the Guidelines in formulating an appropriate sentence.  Id.  In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district

court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

II.  Guidelines Calculation

On March 3, 2019, the defendant pleaded guilty to racketeering. The government respectfully submits that the following Guidelines calculation applies.[1]

<u>R.A. 12: Extortionate Collection of Credit Conspiracy – John Doe #8</u>

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |

<u>R.A. 13: Extortionate Collection of Credit Conspiracy – John Doe #9</u>

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |

<u>R.A. 4: Extortionate Extension of Credit Conspiracy</u>

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |

<u>R.A. 10: Extortionate Collection of Credit Conspiracy – John Doe #6</u>

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |

<u>R.A. 11: Extortionate Collection of Credit Conspiracy – John Doe #7</u>

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |

<u>R.A. 14: Extortionate Collection of Credit Conspiracy – John Doe #10</u>

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |

<u>R.A. 15: Extortionate Collection of Credit Conspiracy – John Doe #11</u>

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |

<u>R.A. 16: Extortionate Collection of Credit Conspiracy – John Doe #12</u>

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |

---

[1]  In his plea agreement with the government, the defendant stipulated to this calculation.

R.A. 17: Extortionate Collection of Credit Conspiracy – John Doe #13

    Base Offense Level (§2E2.1(a))      20

R.A. 18: Operation of Illegal Gambling Business – Sports-Betting

    Base Offense Level (§2E3.1(a)(2)(A))      12

R.A. 19: Operation of Illegal Gambling Business – Super Bowl Pool

    Base Offense Level (§2E3.1(a)(2)(A))      12

R.A. 20: Operation of Illegal Gambling Business – Video Gambling Machines

    Base Offense Level (§2E3.1(a)(2)(A))      12

R.A. 21: Operation of Illegal Gambling Business – March Madness Pool

    Base Offense Level (§2E3.1(a)(2)(A))      12

Multiple Racketeering Act Analysis (§ 3D1.4)

    Highest Adjusted Offense Level      20

        Units:

| | |
|---|---|
| Racketeering Act 12 (§ 3D1.4(a)) | 1 |
| Racketeering Act 13 (§ 3D1.4(a)) | 1 |
| Racketeering Act 4 (§ 3D1.4(a)) | 1 |
| Racketeering Act 10 (§ 3D1.4(a)) | 1 |
| Racketeering Act 11 (§ 3D1.4(a)) | 1 |
| Racketeering Act 14 (§ 3D1.4(a)) | 1 |
| Racketeering Act 15 (§ 3D1.4(a)) | 1 |
| Racketeering Act 16 (§ 3D1.4(a)) | 1 |
| Racketeering Act 17 (§ 3D1.4(a)) | 1 |
| Racketeering Act 18 (§ 3D1.4(b)) | ½ |

|  |  |  |
|---|---|---|
| Racketeering Act 19 (§ 3D1.4(b)) | ½ | |
| Racketeering Act 20 (§ 3D1.4(b)) | ½ | |
| Racketeering Act 21 (§ 3D1.4(b)) | ½ | |
| Total Units | 11 | |
| Levels Added (§ 3D1.4): | | +5 |
| Less: Acceptance of Responsibility (§3E1.1) | | -3 |
| Less: Global resolution (§5K2.0) | | -1 |
| Total: | | 21 |

An adjusted offense level of 21, with a Criminal History Category of I, carries a range of imprisonment of 37 months to 46 months.

III. A Sentence Within the Applicable Guidelines Range Is Appropriate In This Case

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence within the applicable guidelines range is appropriate in this case, and a more lenient sentence is not warranted.

A. The Nature and Circumstances of the Offense and The Defendant's History and Characteristics

The nature and circumstances of the offense and the defendant's history and characteristics warrant a sentence within the applicable guidelines range. The defendant has been convicted of racketeering, including, as racketeering acts, extortionate collections of extensions of credit, in connection with the Colombo family. This is a serious crime that warrants a serious punishment.

The defendant and his criminal partners operated a lucrative loansharking business, as part of which they intimidated multiple victims over a period of more than a year. Significantly, the loansharking business was supported by the Colombo family, a dangerous criminal enterprise that uses violence, including murder, to further its interests, and the defendant's criminal membership in the Colombo family reflects his commitment to its violent goals and enabled him to commit the racketeering acts to which he admitted. For example, when a loanshark customer failed to timely make a payment, the violent reputation of the defendant and the Colombo family to which the defendant has sworn his loyalty, enabled the defendant to obtain payment by extortion, that is, through the credible threat of violence. Like many involved in La Cosa Nostra, Difalco used a legitimate business – a bar called Tryst, which Difalco operated – to facilitate his criminal activity and limit detection by law enforcement. Specifically, he used the bar to attract new loansharking customers and

8

used his employees to collect loansharking payments. He also used the bar to operate and promote his illegal gambling businesses.

Difalco's history and characteristics also favor a sentence within the guidelines range. The defendant has been an associate and then member of the Colombo family for many years, demonstrating that – notwithstanding his lack of a criminal history – the defendant has made a lifelong commitment to a life of crime. In addition to the serious crimes to which Difalco pleaded guilty, Difalco also made clear that he himself was willing to engage in violence in other regards as well. Upon learning that a friend of his daughter's had crashed his car, Difalco calmly told a family member (#12160), "I am going to explode and go to this kid's house. And they'll regret. And I'm not threatening you but they'll regret the day I ring the bell today. … But I'm going to tell you something: I'll sever this kid's head, his father's head." In other calls (#12172 and #12213), Difalco ranted to his daughter that he was going to Staten Island to find his daughter's friend who had crashed his car and was going to "traumatize" the friend's parents and that he was going to "bust [the friend's] fucking skull." Difalco then called directory assistance (#12216) to obtain a telephone number for the friend, but was not successful.

    B.    <u>Reflecting the Seriousness of the Offenses, Promoting Respect for the Law and Providing Just Punishment</u>

A sentence within the applicable guidelines range is also necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offenses are serious crimes and merit a serious punishment.

    C.    <u>Affording Deterrence and Protecting the Public</u>

Finally, the sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." <u>United States v. Davis</u>, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010). A sentence within the applicable guidelines range is warranted in light of both of these considerations.

## CONCLUSION

In this case, given all of the facts and circumstance discussed above, a sentence of imprisonment within the applicable guidelines range is warranted, and a lesser sentence would not satisfy the statutory purposes of sentencing.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/
Elizabeth Geddes
Mathew Miller
Assistant U.S. Attorneys

cc:     Clerk of Court (WFK) (by ECF)
        Vincent Martinelli, Esq. (by ECF)